IN RE APPLICATION OF MCKINNEY.

[Cite as *In re Application of McKinney,* 134 Ohio St.3d 260, 2012-Ohio-5635.]

*Attorneys—Character and fitness—Dishonest conduct and lack of candor during application process require disapproval of application to take the bar exam—Applicant may apply to take the July 2014 bar exam.*

(No. 2011-1520—Submitted March 20, 2012—Decided December 5, 2012.)

ON REPORT by the Board of Commissioners on Character and

Fitness of the Supreme Court, No. 495.

————————————

**Per Curiam.**

{¶ 1} Michele L. McKinney of Cincinnati, Ohio, registered as a candidate for admission to the practice of law in June 2010 and applied to take the February 2011 bar examination. The admissions committee of the Cincinnati Bar Association disapproved McKinney's application based on her lack of candor regarding her conduct during her employment with a Cincinnati law firm in her first year of law school and the reasons that that employment was terminated. McKinney appealed and applied to take the July 2011 bar examination. After conducting a hearing, a three-member panel of the Board of Commissioners on Character and Fitness issued a report recommending that McKinney's application be denied because she did not at that time possess the requisite character, fitness, and moral qualifications to be admitted to the bar. The panel, however, recommended that she be permitted to apply as a candidate for the July 2014 bar exam. The full board adopted the panel's findings of fact, but citing McKinney's contradictory testimony, evasiveness, and lack of candor throughout the admissions process, recommended that she not be permitted to reapply in the future.

**{¶ 2}** Although McKinney concedes that we should disapprove her current application to take the bar examination, she objects to the board's recommendation that she be forever barred from reapplying and urges us to permit her to take the February 2013 bar exam. We adopt the board's findings of fact and recommendation that McKinney's current application be disapproved. However, we sustain her objection in part and will permit her to reapply for the July 2014 bar exam.

### Summary of Proceedings

**{¶ 3}** McKinney began her law school career at the Salmon P. Chase College of Law at Northern Kentucky University ("NKU") in August 2007. The following month, she accepted a paralegal position at the Cincinnati law firm of Lerner, Sampson & Rothfuss ("LSR").

**{¶ 4}** Before deciding to attend law school, McKinney had signed a lease for an apartment in Louisville that she planned to occupy with her sister. Her sister had not signed the lease because she had a mortgage that they believed would financially disqualify her as a lessee. McKinney's sister occupied the apartment, but she began to experience serious health problems that prevented her from working and left her unable to pay the rent. The sister planned to vacate the premises, but McKinney would remain financially responsible for the three to four months that remained on the lease. When she inquired about terminating the lease early, McKinney was advised that she could sublet the property or her lease could be canceled if she was transferred by her employer.

**{¶ 5}** Instead of attempting to sublease the property, McKinney planned to fake an employment transfer by fraudulently producing two documents on her employer's letterhead—one to verify her transfer from Louisville to Cincinnati, and the other to acknowledge that she had accepted the transfer. Both letters were purportedly drafted for the firm by employee Kelly Richards, but Kelly Richards did not exist. Concerned that the landlord would call the firm to verify her

transfer, and believing that the landlord would recognize her voice, McKinney changed the voicemail on a phone used by her sister to state that the caller had reached the desk of Kelly Richards. McKinney's sister would then call back and pretend to be Ms. Richards.

{¶ 6} McKinney's employer had a strict policy forbidding employees from using company e-mail for personal purposes. Believing that McKinney was violating the policy, the firm's human resources director, Rachel Faris, began to monitor her e-mail account in real time. Faris discovered that McKinney was sending e-mails and then immediately deleting them from her sent folder. Faris became more suspicious on March 21, 2008, when in the process of printing some of those e-mails before McKinney deleted them, she found one that said, "I need a contact number for my fake human resources person." On further investigation, Faris found an e-mail with the falsified letters on the firm letterhead attached. Based upon the information uncovered by Faris's investigation, Teresa Miller, the firm's chief operating officer, fired McKinney and her boyfriend (now husband) that same day.

{¶ 7} In her application to register as a candidate for admission to the practice of law, McKinney stated that her reason for leaving employment in March 2008 was "terminated/conflicted with school schedule." Later in her application, she explained, "I was fired [for] using company email for personal reasons."

{¶ 8} Before conducting McKinney's character-and-fitness interview, the Cincinnati Bar Association contacted LSR, seeking additional information about McKinney's termination, and learned of her scheme to defraud her landlord. The attorneys assigned to conduct her interview asked open-ended questions, giving McKinney the opportunity to fully disclose the circumstances of her termination. McKinney, however, did not voluntarily disclose that she had created the fictitious letters on her employer's letterhead. Nor did she

acknowledge that the letters were the cause of her termination. When the interviewers revealed their knowledge of the letters, McKinney was evasive.

{¶ 9} After the interview, McKinney grew concerned about the letters and left a voicemail for one of the interviewers, asking him to call her if he had additional questions, but the interviewers had already decided to recommend that her application be disapproved.

{¶ 10} By the time the matter came before the full admissions committee of the Cincinnati Bar Association, both McKinney and the committee had obtained copies of her employment records and had had the opportunity to review them. Included in those records was a memo that Faris had prepared to memorialize McKinney's termination meeting. Faris wrote that she attended the meeting in which Miller told McKinney that her employment was being terminated for violating company policy. Faris wrote that Miller advised McKinney that she was very disturbed to discover that McKinney had falsified documents on firm letterhead to avoid liability for her lease and that she had sent an excessive number of personal e-mails on company time. Faris also noted that she had personally notified the landlord of McKinney's scheme to avoid her lease obligation.

{¶ 11} Despite having reviewed Faris's letter and acknowledging that she had planned an elaborate scheme to extricate herself from her lease, McKinney testified that she did not recall being informed that the false letters on the firm's letterhead were the reason for her termination. Although she expressed her understanding of the serious nature of her conduct, she attempted to excuse her evasiveness at her character-and-fitness interview, claiming that she had forgotten many of the details. Expressing serious concerns about McKinney's poor judgment and lack of candor, the full admissions committee recommended that her application be disapproved.

{¶ 12} At the June 30, 2011 hearing before a three-person panel of the Board of Commissioners on Character and Fitness, McKinney testified that she was never told that her employment was terminated for using the firm's letterhead to create the fictitious letters. She stated that she was called to the firm's human resources office and that before she was fully seated, Miller told her that she was being terminated. McKinney observed a quarter-inch stack of paper that appeared to be personal e-mails sitting on Miller's desk. Recognizing the top e-mail as an exchange between herself and her boyfriend that contained embarrassing comments, she declined the opportunity to review the documents with Miller. She was then escorted to her desk and from the building. While this version of events was consistent with McKinney's statement in her application and her prior testimony, it did not comport with Faris's testimony that her March 21, 2008 memorandum accurately memorialized the termination meeting. The panel believed that Faris's testimony and contemporaneous memorandum were more credible than McKinney's testimony and therefore found that McKinney had been advised that her creation of the fictitious letters on the firm's letterhead and her excessive personal e-mails were the basis for her termination.

{¶ 13} The panel found the remainder of McKinney's record unremarkable, despite her 2001 conviction for operating a vehicle while under the influence of alcohol and five speeding tickets. Noting that McKinney did not report two of the speeding tickets on her application, the panel attributed that omission to inattention rather than deliberate misrepresentation. In contrast to McKinney's deceptive conduct, the panel noted that she had volunteered at a domestic-violence and sexual-assault center, a street-law diversion program through the juvenile court, and an animal shelter, and that she had served as the president of the Student Advocacy Society while in law school. She also presented five character references, including three letters from professors at NKU, and a letter from a former employer, attorney Harry Sudman. Her current

employer, attorney Thomas Richards, testified at the panel hearing that she has worked for him since October 2008 and that he planned to keep her on after she is admitted to the practice of law because she is a thorough researcher, interacts well with clients, and gets good results. Although Richards believed that McKinney was honest and had no reservations about her sitting for the bar exam, the panel did not believe that he knew all the circumstances of her termination. The panel recommended that her application be disapproved and that she be permitted to reapply for the July 2014 bar exam.

{¶ 14} The board adopted the panel's findings of fact, but noting that McKinney was a 30-year-old law student when she engaged in deceptive behavior to avoid liability on her lease and that she was evasive throughout the admissions process, the board concluded that she would never be able to establish her character and fitness to practice law. Therefore, the board recommended that her application be disapproved and that she not be permitted to reapply for admission to the practice of law in Ohio.

**McKinney's Objections to the Board's**

**Recommended Sanction**

{¶ 15} McKinney objects to the board's recommendation that she be forever barred from applying for the Ohio bar exam. She contends that she has matured since her first year of law school, that her life is more stable, and that the lengthy admissions process she has endured has had a profound impact on her. She contends that although she was in her second semester of law school when she falsified letters to avoid her lease, she had not received any instruction in professional responsibility. Having completed her legal education, she argues that she has a much better understanding of the high level of honesty and integrity that attorneys must strive to maintain.

{¶ 16} In her objections, however, McKinney maintains that she was honest and forthright in her character-and-fitness interview because she answered

"yes" when asked if she drafted the letter regarding her lease. She argues that when asked how she dealt with the remainder of the lease, she replied that she found someone to sublease the apartment. McKinney characterizes this answer as "fully and honestly disclosing the facts." McKinney contends that the board has placed undue weight on the reason given for her termination and her decision to falsify the letters—even though she never sent them. She asserts that her piecemeal disclosure of the relevant facts was not caused by any intent or attempt to conceal her conduct, but was a defensive response to what she perceived as an adversarial proceeding.

{¶ 17} McKinney urges this court to reject the panel's assessment of the credibility of the witnesses and to find that her testimony was more credible than that of Faris. She points to alleged inconsistencies in Faris's testimony, argues that much of that testimony is hearsay because Faris did not speak during the termination meeting, and suggests that Faris destroyed or altered evidence and had a motive to lie to place herself and her firm in a good light.

{¶ 18} Much of Faris's testimony was based upon her personal knowledge of (1) the investigation she conducted into McKinney's improper use of the firm's e-mail system for personal purposes, (2) the discoveries she made during that investigation, (3) the recommendation she made to Miller, and (4) the actions she observed Miller take in immediate response to that recommendation. That testimony is not hearsay because it is not the statement of someone other than Faris. *See* Evid.R. 801(A) (defining hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted"). Moreover, to the extent that Faris's testimony and written statements relate what Miller said at the meeting, they were not hearsay because they were not offered to prove the truth of the matter asserted, i.e., the actual reasons why the firm terminated McKinney's employment. Rather, they are offered to demonstrate what McKinney was told

about her termination.  Therefore, we do not find Faris's testimony or her March 21, 2008 memorandum objectionable.  Further, we reject McKinney's claim that Faris's destruction of her handwritten notes after preparing her typewritten memorandum was somehow suspect.

{¶ 19} The panel and board found that Faris's testimony and her memorandum memorializing the events of the termination meeting were more credible than McKinney's own self-serving testimony.  In our independent review of professional-discipline cases, we generally defer to a panel's credibility determinations unless the record weighs heavily against those findings, because the panel observed the witnesses firsthand.  *Cincinnati Bar Assn. v. Statzer,* 101 Ohio St.3d 14, 2003-Ohio-6649, 800 N.E.2d 1117, ¶ 8, citing *Cleveland Bar Assn. v. Cleary*, 93 Ohio St.3d 191, 198, 754 N.E.2d 235 (2001).  In admissions matters, the panel of the Board of Commissioners on Character and Fitness is, likewise, in the best position to assess the credibility and weight of testimony because it hears the testimony firsthand and can evaluate a witness's demeanor, tone, and inflection, which are not preserved in the record.  Therefore, we find that the credibility determinations of a panel of the Board of Commissioners on Character and Fitness should receive the same deference.

{¶ 20} McKinney's testimony that she did not link the termination of her employment to the falsified documents she created on her employer's letterhead and sent through her work e-mail just hours before her employment was terminated strains credulity.  Even if she did not recall the stated reasons for the termination of her employment or had blocked the events from her mind due to the passage of time and difficult personal circumstances—including her sister's illness, her own difficult pregnancies, and the premature births of her two sons during the pendency of this admissions matter—she bears the burden to prove by clear and convincing evidence that she possesses the requisite character, fitness,

and moral qualifications for admission to the practice of law. *See* Gov.Bar R. I(11)(D)(1).

{¶ 21} We have stated:

> The paramount concern in proceedings before the Board of Commissioners on Character and Fitness is whether the applicant possesses those moral traits of honesty and integrity which will enable him to fully and faithfully discharge the duties of our demanding profession. We view such proceedings as being different from the adversary contest associated with, for example, disciplinary cases. A hearing to determine character and fitness should be more of a mutual inquiry for the purpose of acquainting this court with the applicant's innermost feelings and personal views on those aspects of morality, attention to duty, forthrightness and self-restraint which are usually associated with the accepted definition of "good moral character." Such a view commands the utmost in cooperation between the applicant and the board, and leaves little room for the employment of doctrines which work to keep relevant information from the board. Although those devices are valid and proper in many instances, they should not be invoked before a body whose sole function is to fully determine all the facts which can logically reflect upon the wisdom of admitting an applicant with a questionable background to the practice of law.

*In re Application of Davis,* 38 Ohio St.2d 273, 274-275, 313 N.E.2d 363 (1974).

{¶ 22} Here, McKinney was less than candid throughout the admissions process. Regardless of her understanding of the reasons for her termination, once

the committee members began to ask questions about the letters she had falsified, McKinney should have fully disclosed the circumstances surrounding her drafting of the letters, the content of those letters, and the reason that she failed to send the letters. Instead, she disclosed only that she had "drafted a letter for personal use on law firm letterhead." She did not voluntarily divulge that the purpose of the letter was to breach her legal obligations under the lease, that she had contrived a fictitious human resources representative, or that she had planned to have one of her sisters portray the fictitious representative if the landlord attempted to confirm the content of the letter.

{¶ 23} McKinney's explanations for her conduct were ever-changing. Though she admitted that she had received a copy of her personnel file, she testified that she had not reviewed it in its entirety before her interview with the full admissions committee of the Cincinnati Bar Association. She later admitted that her husband had read the file, noticed the memorandum from Faris, and advised her that the falsified letters were discussed in the memorandum. Despite her possession of her personnel file and her husband's statements, she told the full admissions committee that she did not recall the details of the circumstances giving rise to her termination. At the panel hearing, however, McKinney admitted that it had crossed her mind that her termination may have been related to the letters she had falsified on the firm's letterhead.

{¶ 24} An applicant's failure to provide complete and accurate information concerning his or her past false statements, including omissions, and acts involving dishonesty, fraud, deceit, or misrepresentation are all factors that may constitute a basis for disapproval of the applicant. *See* Gov.Bar R. I(11)(D)(3). McKinney admitted that she knew that it was against firm policy to use her employer's e-mail for personal purposes, but she did it and tried to cover up her deceit by immediately deleting the sent e-mails. She knew that it was wrong to falsify letters on her employer's letterhead, but she did it anyway. And

although McKinney attempted to portray her drafting of the falsified letters as the act of a caring sister stepping in to help her gravely ill sister, in truth, McKinney was contractually bound by the lease. Moreover, McKinney's dishonesty and misrepresentation did not end with her first year of law school, but continued on her application as a candidate for admission to the bar and throughout the admissions process.

{¶ 25} Despite McKinney's recent and troubling pattern of dishonest conduct, the panel members expressed their belief that with time, McKinney could rehabilitate herself and one day prove that she possesses the requisite character, fitness, and moral qualifications for admission to the practice of law. We agree. McKinney applied herself in law school, has engaged in valuable volunteer experiences, and has presented testimony and letters from three of her law school professors, a former employer, and her current employer who represented her before this court and hopes she will one day work as an attorney in his office. Furthermore, McKinney appears to be genuinely remorseful for her conduct in drafting the falsified letters on LSR letterhead. We believe that McKinney may mature with time and may one day be able to demonstrate that she possesses the requisite character, fitness, and moral qualifications to be admitted to the bar of Ohio. We therefore adopt the board's findings of fact, disapprove McKinney's current application to take the bar exam, sustain McKinney's objection in part, and adopt the panel's recommendation that she be permitted to reapply as a candidate for the July 2014 bar examination by submitting a new application to register as a candidate for admission to the bar and an application to take the bar examination. At that time, she shall submit to a full character-and-fitness investigation.

Judgment accordingly.

O'CONNOR, C.J., and PFEIFER, LUNDBERG STRATTON, O'DONNELL, LANZINGER, CUPP, and MCGEE BROWN, JJ., concur.

_____

Thomas D. Richards, for applicant.

Mann & Mann, L.L.C., and Michael T. Mann; and Thompson Hine, L.L.P, and Christopher D. Wiest, for the Cincinnati Bar Association.

_____